1         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF HAWAII

2

3            - - -

KERRY SHANNON,               )

4         Plaintiff,     )

                         )

5       vs.             )  No. CV04-00086

                         )     SPK/LEK

6  CITY AND COUNTY OF HONOLULU; HONOLULU )

   LIQUOR COMMISSION; DENNIS ENOMOTO, in )

7  his official capacity as chairman of   )

   the Honolulu Liquor Commission; WALLACE )

8  W. WEATHERWAX, individually and in his )

   capacity as an agent and employee of   )

9  the Honolulu Liquor Commission; JOHN   )

   CARROLL, individually and in his      )

10  capacity as an employee of the Honolulu )

   Liquor Commission; ANNA HIRAI,       )

11  individually and in her capacity as an )

   employee of the Honolulu Liquor      )

12  Commission; ALLAN GAYLORD, individually )

   and in his capacity as an employee of  )

13  the Honolulu Liquor Commission; JOHN   )

   DOES 1-10; JANE DOES 1-10; DOE        )

14  CORPORATIONS 1-10; DOE PARTNERSHIPS   )

   1-10; DOE GOVERNMENTAL AGENCIES 1-10;  )

15          Defendants.      )

   ----------------------------------------

16

17                 **CERTIFIED COPY**

18              DEPOSITION OF

19        KERRY SHANNON, VOLUME II

           SEATTLE, WASHINGTON

            MAY 23, 2006

20

21

22  Atkinson-Baker, Inc.

   Court Reporters

23  (800) 288-3376

   www.depo.com

24

25  REPORTED BY:  TONI L. ZIOMAS, CSR NO. 2926

   FILE NO.: A0041DA

EXHIBIT __"B"__

1

1    Internet to do research, read the Hawaii paper, anything like

2    that, keep up?

3        A.    Depends.  I do all of that.  I do research

4    sometimes.  Sometimes I just check e-mail.

5        Q.    Any problems with doing that?

6        A.    Prior to that, no.

7        Q.    I'm sorry.  Prior to your back injury?

8        A.    Prior to my back injury.

9        Q.    No problems?

10        A.    I only do it maybe 30 minutes, an hour, a day.

11        Q.    When you did it before your back injury you had no

12    problems; is that correct?

13        A.    No, I had no problems.

14        Q.    We talked about it at some point yesterday, but in

15    terms of your injuries that caused you to resign from the

16    police department, who provided you with the doctor's opinion

17    for that?

18        A.    I don't recall.

19        Q.    In January 2003 did you ask Dr. Rasmussen to

20    provide you with a letter indicating that you would not be

21    able to perform your job?

22        A.    Yes.  The ERS said I needed more documentation.

23    That's what I called and asked her.

24        Q.    That was after you had filed your application for

25    medical retirement in November of 2002?

1    A.    Correct.

2    Q.    At that time when you asked her for the letter

3  documenting -- or to provide further documentation for your

4  medical retirement, did you tell her anything about the work

5  situation and your alleged harassment and hostility?

6    A.    I didn't speak with the doctor.  I spoke with the

7  clerk so I didn't discuss it.

8    Q.    Prior to Dr. Rasmussen issuing her letter to the

9  State of Hawaii Employees's Retirement System, did you ever

10  talk to her about that?

11    A.    Not about stress, but I talked to her about the

12  excessive computer work I had to do and that was causing my

13  migraines to increase and the pain in my neck.  She suggested

14  I ask for a computer table, which I did.  Since I was never

15  given it, it just exacerbated the condition.

16    Q.    Did she ever write a letter recommending or

17  requesting that you be given that computer table?

18    A.    No.

19    Q.    Did you ask her to?

20    A.    No.  I asked my supervisor for one and he didn't

21  say I needed to get a doctor's -- if due process required it,

22  she would have written one.

23    Q.    Did Dr. Rasmussen tell you that your headaches were

24  due to spasms in the cervical spine?

25    A.    Yes.

1      Q.    Did she tell you it is not safe for you to subdue a

2  suspect?

3      A.    I don't recall.

4      Q.    Did you feel it was safe for you to subdue a

5  suspect?

6      A.    No.

7      Q.    Your activities as a liquor control investigator in

8  the Enforcement Division, would that on occasion require you

9  to subdue a suspect?

10     A.    It could.

11     Q.    In the Licensing Division would it require you to

12 subdue a suspect?

13     A.    Not subdue a suspect, but we could possibly get

14 into altercations in the premises when we go into them.

15     Q.    Did Dr. Rasmussen tell you it was her opinion that

16 you could not perform your usual job without limitations?

17     A.    Correct.

18     Q.    And what recommendation did she have for you with

19 regard to your work?

20     A.    I don't recall.  I believe it was retirement.

21     Q.    She told you that, based upon the information that

22 you provided her, correct?

23     A.    Correct.

24     Q.    In other words, she had no basis to say it was due

25 to the work situation in terms of harassment and hostility,

1  correct, because she didn't know about that, to your

2  knowledge?

3                 MR. POTTS:  I'm sorry.  Could I have that

4  question reread?

5                 MR. YAMAMOTO:  Sure.

6                 MR. POTTS:  Could you read the question back?

7                 (Question on Page 32, Lines 24 and 25, Page

8                    33, Lines 1 and 2, read by the reporter.)

9

10                 THE WITNESS:  It wasn't related to the stress,

11  but it was related to the computer work.

12      Q.  Right.  But not related to any of your claims with

13  regard to harassment and a hostile work environment, correct?

14      A.  Correct.

15      Q.  Was there a period or a time -- excuse me -- that

16  you asked to be reassigned from the Licensing back to

17  Enforcement?

18      A.  Yes.

19      Q.  And what happened?

20      A.  I was sent back.

21      Q.  You were sent back to Enforcement?

22      A.  Correct.

23      Q.  Did you ask to then be reassigned again then to

24  Licensing?

25      A.  Yes.

1    Q.    Per your request it was done?

2    A.    Yes.

3    Q.    Why did you request reassignment?

4    A.    I felt my life was in jeopardy.  Although they

5    reassigned me to Licensing, they made me still sit in the

6    Enforcement Division so I still had the hostile work

7    environment.

8    Q.    When was it that you were reassigned to Licensing

9    per your request?

10    A.    Somewhere the end of October of 2002, I believe.

11    Q.    Initially when you were assigned to Licensing was

12    when?

13    A.    I believe it was July 2002.

14    Q.    In 2001 was there a time you requested Licensing

15    reassignment?

16    A.    I don't recall.  Wait.  I stand corrected.  I did

17    ask.  There was a -- under a different supervisor there was a

18    training position.  They were trying to do three-month

19    training and then back to Enforcement.

20    Q.    Do you recall your stepfather being in poor health

21    in 2001?

22    A.    He has been in poor health since I have known him.

23    Q.    Who is your stepfather?

24    A.    Louis Mendes.

25    Q.    He lives on Kauai?

1    Q.    And you agreed?

2    A.    Yes.

3    Q.    And that would allow you to be available during the

4  day?

5    A.    Correct.

6    Q.    And that was one of the options you requested?

7    A.    Correct.

8    Q.    So long as the hours were adjusted, you were

9  willing to stay in Licensing, correct?

10   A.    For the remainder of the three months that I was

11 going to be assigned there.  It wasn't a permanent transfer

12 to Licensing.

13   Q.    I understand.  But the Liquor Commission

14 Administrator complied with your request.

15   A.    Actually Tom Mendonca complied with it.  He was the

16 one making the rotations between the things.  He was tasked

17 by Weatherwax to move people.  It didn't have to be approved

18 by Weatherwax.

19   Q.    Okay.  But that was a responsibility that Mr.

20 Weatherwax delegated to him, to your knowledge?

21   A.    Yes.

22   Q.    There was a situation, I guess, in April of 2002

23 involving Little Seoul, a business establishment entitled

24 Little Seoul.  Do you recall that?

25   A.    Yes.

1    Q.    You had cited them?  I'm sorry.  You and Ken Wright

2    had cited them?

3    A.    I cited them and Ken Wright was my partner that

4    night.

5    Q.    The manager on duty had made an allegation against

6    a fellow investigator.  I think it was William Leong,

7    correct?

8    A.    What do you mean by an "allegation"?

9    Q.    That's all I know; that she made an allegation

10   against Investigator Leong.

11   A.    She made a comment concerning.

12   Q.    What was the comment then?

13   A.    She was in the kitchen and she was going to call

14   him.  She told me that -- I asked her why she was calling him

15   and she said, "I pay Willie and he helps."  I don't know if

16   that meant he helps get rid of tickets or if he helps

17   interpret because she was Korean and had a hard time with

18   English.  She didn't specify what his help was.

19   Q.    Did you later find out what her allegation was?

20   A.    No.

21   Q.    You didn't think it was an allegation regarding

22   taking a bribe?

23   A.    I just stated it the way it was.

24   Q.    Who did you report this to that night or that day?

25   A.    I put it in my report, my violation report, and

1    sent it through to the chain of command.

2        Q.    Did you report it to the night supervisor?

3        A.    I don't recall.

4        Q.    Did you report it to Allan Gaylord?

5        A.    Via the report, and my night supervisor had to see

6    the report that I turned in.  I'm assuming he also read it.

7        Q.    When did you turn in the report?

8        A.    I believe it was that night.  It may have been the

9    next day.

10       Q.    According to the record I'm looking at, the

11   citation occurred on March 31, 2002, on a Sunday.  Does that

12   sound correct or you have no idea?

13       A.    I have no idea.

14       Q.    Were you reprimanded for not reporting it?

15       A.    Yes.

16       Q.    Did you explain that you did report it in a written

17   report?

18       A.    Yes.

19       Q.    Do you have a copy of that written report?

20       A.    No.

21       Q.    Have you seen a copy of that written report?

22       A.    The one I turned in, yes.  I wrote the report so I

23   saw it.

24       Q.    I'm sorry.  Have you since seen it after turning it

25   in?

1    A.    No.

2    Q.    Did you report this comment by the manager at

3  Little Seoul to the FBI?

4    A.    Yes.

5    Q.    When you reported this comment did you infer that

6  it was a bribe?

7    A.    I don't believe so.

8    Q.    Why did you report it to the FBI then?

9    A.    I was directed that if anybody said anything, to

10  let them know and they would determine if it was relevant or

11  not.

12    Q.    Were you reprimanded for reporting it to the FBI?

13    A.    Yes.

14    Q.    By whom?

15    A.    Allan Gaylord.

16    Q.    What did he say?

17    A.    To my knowledge, I recall him saying that I don't

18  work for the FBI.  I work for the Liquor Commission and I'm

19  to go through them, not to be talking to the FBI.

20    Q.    Did he write that in a report to you?

21    A.    I don't recall.

22    Q.    Do you know if it was only oral?

23    A.    I know he wrote something, but I don't know if he

24  wrote that comment in it.  The oral comments he gave me was

25  that.  I believe he put something in the report that I wasn't

1   a team player.

2              MR. POTTS:   Counsel, just for the record, was

3   Mr. Shannon's written report part of the documents that were

4   produced by the City and County?

5              MR. YAMAMOTO:   I don't know.

6              (Exhibit No. I marked for identification.)

7

8        Q.   I'm going to hand you --

9              MR. POTTS:   Let me see this for a second.

10  (Reviewing document.)

11       Q.   I have handed you Exhibit I, which is CC 186.   Did

12  you receive this from Mr. Gaylord on or about April 10, 2002?

13       A.   That's when it was dated.   I don't know when I

14  received it.   I would assume that's when I did receive it.

15       Q.   Do you have any information that would -- or any

16  recollection that although it's dated April 10, somehow you

17  received it days later or something like that?

18       A.   No.   It said he needed a response by the 12th.   So

19  if my response is by the 12th, then I must have gotten it on

20  the 10th, but I don't actually recall receiving it on that

21  date.

22              MR. POTTS:   May I see this?   (Reviewing

23  document.)

24              (Exhibit No. J marked for identification.)

25  ////

42

1    Q.   I'm going to hand you a series of documents.   It's

2  not consecutive, but I believe they all involve the same item

3  with regard to the Little Seoul issue.   It's four pages that

4  comprise Exhibit J.   I'll have your attorney look at it

5  first.

6              MR. POTTS:   (Reviewing document.)

7    Q.   Do you need a break?

8    A.   I just need to stand for a while.

9    Q.   Sure.   Your counsel has handed you the Exhibit J.

10  Did you either send and/or receive these pages?

11    A.   That you have handed me?

12    Q.   Yes, Exhibit J.

13    A.   Yeah, I received them now.   I didn't get all of

14  these prior.   I didn't get this memorandum in the past.   That

15  went from Mr. Weatherwax to the FBI.

16    Q.   That's what I would ask.   How do you recognize Page

17  CC 185 as coming from Mr. Weatherwax?

18    A.   I believe it has his name in there.

19    Q.   Can you point out where it is?   I was going to ask

20  you who sent that.

21    A.   (Reviewing document.)   Well, the fact that he says,

22  "The staff and chief investigator," and he is John Carroll's

23  boss, as well as Miles Yamane told me that he got a

24  memorandum from Mr. Weatherwax, when I met with him.

25    Q.   Did Miles Yamane or you feel that it was improper

1  for Mr. Weatherwax to send this memorandum?

2      A.   No.

3      Q.   Was it proper?

4      A.   I guess.

5          MR. POTTS:  Just for the record, they're

6  referring to CC 185.  And for the record, Mr. Weatherwax's

7  initials are at the end of the memorandum.

8      Q.   I believe that probably is correct, but I don't

9  know.  That's why I was wondering.  The TX WWW?

10     A.   Yeah.  They call him -- it's Wallace W. Weatherwax

11 so we all used to refer to him as W-3.

12     Q.   Other than CC 185, the other pages of Exhibit J you

13 did either send or receive, correct?

14     A.   Yes.

15     Q.   And the information that you sent was accurate, of

16 course, correct?

17     A.   Yes.

18     Q.   The information you received, was it accurate, or

19 did you have any objection to it?

20     A.   Give me a moment to read it a little closer,

21 please.  (Reviewing document.)

22          I was told to amend my report and remove that

23 section from my violation report.  As far as I was concerned,

24 that's tampering with the report and I didn't know if I was

25 allowed to take it out or not.

44

1    Q.    But you did.

2    A.    Yeah.

3    Q.    The part that you took out was just put into a

4    different report, correct?

5    A.    It wasn't put into any report.

6    Q.    Wasn't it supposed to be put into a report sent to

7    Mr. Weatherwax?

8    A.    No, not that I recall.  It wasn't put into anything

9    else.

10    Q.    This memo from Allan Gaylord to you dated April 18,

11    2002, which is CC 191 -- and since I don't have a copy, I'll

12    read it to you.  It says, "Please amend your report to

13    exclude the portion in the paragraph 'Manager's Action' in

14    reference to Willie Leong and submit separate incident report

15    to Liquor Commission Administrator Wallace Weatherwax."

16    A.    But none was ever submitted.

17    Q.    But you were instructed to; isn't that true?

18    A.    In this one.

19    Q.    Yes.  You were instructed to, correct?

20    A.    In that paper, yes, but I was -- after that I was

21    verbally told I didn't need to submit it.

22    Q.    This was cc'd to Wally Weatherwax, to Anna Hirai,

23    correct?

24    A.    That's what it says.

25    Q.    Do you have any information to indicate it wasn't?

1     A.    No.

2     Q.    In fact, it's initialed.    Is that initialed by the

3   recipients?

4     A.    Yes.

5     Q.    Which is standard policy?

6     A.    Yes.

7     Q.    Who told you not to send it?

8     A.    Allan Gaylord.

9     Q.    So you never did?

10     A.    No, because William Leong was no longer a City and

11   County employee, and the Liquor Commission -- it didn't

12   matter to them anymore.

13     Q.    Who told you that?

14     A.    Allan.

15     Q.    Did you ever think to check with Mr. Weatherwax if

16   that was correct?

17     A.    No.

18     Q.    Did you get that in writing from Mr. Gaylord?

19     A.    No.

20     Q.    So the only thing in writing you had was his

21   instruction for you to submit a separate report with regard

22   to that, correct?

23     A.    Correct.

24     Q.    And you never questioned him beyond that?

25     A.    Not when he told me it was no longer necessary.

1          MR. POTTS:  Can I see that exhibit when you're

2     through?

3          MR. YAMAMOTO:  Sure.

4          THE WITNESS:  I was never asked by Mr.

5     Weatherwax where the report was.

6          MR. POTTS:  There is no question pending.

7          MR. YAMAMOTO:  I'll wait until you get done.

8          MR. POTTS:  (Reviewing document.)  Can we take

9     a break?  I want to speak with my client.

10          MR. YAMAMOTO:  Okay.

11          (Pause in the proceeding.)

12

13          MR. POTTS:  Mr. Shannon wanted to add

14     something or amend a prior answer.

15          MR. YAMAMOTO:  Okay.

16          THE WITNESS:  As far as submitting a report to

17     Mr. Weatherwax in regards to the Little Seoul, I think it was

18     a little confusion on my part as to -- a report to me has

19     several pages and constitutes a different fact.  I believe

20     Mr. Gaylord told me I didn't have to submit a report, just

21     submit a to/from, which is what I did submit.  If you're

22     referring to that answer or some kind of answer to Mr.

23     Weatherwax, then yes, I did submit something.  It's referred

24     to as a to/from.  That's a memo from me, not a report.

25          Q.   Is that the information that you had previously

47

1    submitted under the Manager's Action?

2        A.    It's various things, but it includes that, yes.

3        Q.    So you weren't deleting that information entirely.

4    It just was put into a separate report.

5        A.    Again, it was put into a to/from, which is a memo.

6    It's not a report.  Reports go into the people's -- the

7    licensee's files.  This does not go into any file with that

8    licensee so it will never be a formal record for theirs.

9    This went to Mr. Weatherwax.  The point was to keep it out of

10   the official records for this licensee.

11       Q.    Okay.  Anything else?

12       A.    No.

13       Q.    My understanding, Mr. Shannon, is on the break we

14   just had, you took some medication.  I want to confirm that

15   you're capable, first of all, but second, also willing to

16   proceed with the deposition?

17       A.    Yes.

18       Q.    What medication did you take?

19       A.    Tramadol.

20       Q.    That is one of the painkillers?

21       A.    Yes.

22       Q.    At any point in time if the medication should have

23   an effect of making you incoherent or unable to answer

24   questions, will you tell us?

25       A.    Yes.

1    would have to tell what case I was working on.

2        Q.    And what if you requested overtime because of,

3    quote, continued FBI investigation?

4        A.    That would be what I would do.  You don't have to

5    have any other documentation.  You just explain to them what

6    the reason is.  You don't have to have any documentation.

7        Q.    So you could just say that and nothing more?

8        A.    Yes.

9        Q.    Were you ever requested to submit further

10   verification?

11       A.    I don't recall.

12       Q.    Do you remember if Mr. Gaylord at some point sent

13   you a memo asking for verification of the agent or agents you

14   met with?

15       A.    I don't recall, but there probably was.

16       Q.    Do you ever recall him asking for some type of

17   verification and that a letter might suffice, indicating that

18   you did meet at a certain date, time, and place, to justify

19   the overtime request?

20       A.    Possibly.

21       Q.    Did you feel that that was harassment?

22       A.    Yes.

23       Q.    So you felt that if you just said you had to meet

24   with the FBI investigation team or investigators, you didn't

25   have to provide any verification that it actually occurred?

1    A.    That wasn't the policy up to that point, and they

2    knew I was cooperating with the FBI.  This stems to an

3    earlier thing where they wanted me to tell them who I was

4    meeting with on what day and what time.  I was instructed by

5    the FBI not to give them any information.  I could say I met

6    with them but no further information.

7    Q.    You couldn't give them date and time?

8    A.    No.  They said don't give them any information.

9    Blanket, that's it.

10   Q.    Not even that you met with the FBI people for two

11   hours or three hours on this date?

12   A.    No.  They told me don't disclose any information to

13   them concerning the case.  As far as I'm concerned, any

14   information is any information.  They knew I was working with

15   them and I could disclose I had a meeting with them and for

16   how long, but not where, when, from what time to what time,

17   because that wasn't the policy.

18   Q.    And not date even?

19   A.    No.  They would have the date.  They would have a

20   date because I have to put in for a specific date.

21   Q.    Sure.  You would put in the date and you would put

22   in the number of hours you're requesting overtime, correct?

23   A.    Correct.

24   Q.    But you couldn't tell them from what time to what

25   time?

53

1    A.    Correct.

2    Q.    Why not?

3    A.    Because it was getting too specific then.

4    Q.    And that was specific instructions from the FBI?

5    A.    No.   The instructions from the FBI was not to give

6    them any information, so I gave them the bare minimum that

7    was required by the City to process.   In every other

8    department and up to that point within our department all you

9    have to do is give them your number of hours and the date you

10   worked your overtime and the reason.   You fill it out on the

11   requisition form.   You don't have to attach any paperwork, no

12   letters.   Nobody else has ever had to do that.

13   Q.    With regard to any request for overtime, you don't

14   have to provide verification.   Is that what you're saying?

15   A.    Only subpoenas.

16   Q.    So the only time you have to do it is for court

17   appearance?

18   A.    Correct.

19   Q.    Otherwise there is absolutely no provision pursuant

20   to City standards and department guidelines that you do so?

21   A.    Correct.

22   Q.    Have you ever reviewed any of that, the City

23   standards and department guidelines?

24   A.    At some point in my career I am sure I have.

25   Q.    Were you interviewed with regard to the Charles

1    A.    I believe so.

2    Q.    Similar claims that you're making?

3    A.    Similar as well as others above and beyond.  I

4    think he had some worker's compensation claims.

5    Q.    So when you say others above and beyond, meaning

6    not other employees making similar claims but other claims up

7    above and beyond yours, correct?

8    A.    Correct.

9    Q.    During that interview with Anna Hirai and this

10   deputy corporation counsel, did you ever indicate any

11   harassment or hostility that you experienced?

12   A.    No.

13   Q.    Why not?

14   A.    I was afraid to.

15   Q.    Why?

16   A.    Because Anna Hirai was at the thing.  For all other

17   depositions I have given in lawsuits I meet with corp

18   counsel.  The other defendants in the case when they met on

19   this lawsuit such as Ken Wright, he just met with corp

20   counsel.  In this case since I was more or less ordered to go

21   over there by Allan Gaylord, Anna Hirai accompanied me for

22   some reason and I believed it was to make sure I was saying

23   the right things.

24   Q.    You don't know whether or not she was instructed to

25   attend?

1    A.    I don't know who instructed her to attend.    I'm

2  sure she was instructed, but I don't know who.

3    Q.    You don't know if she was instructed to attend?

4    A.    No.

5    Q.    Would it surprise you if it was me?

6    A.    No.

7          MR. POTTS:    Is that a question?

8    Q.    It is.

9    A.    Nothing surprises me anymore.

10   Q.    Did you tell them, the interviewers, at that

11  interview that Mr. Wiggins was doing the lawsuit to get

12  money?

13   A.    Yes.

14   Q.    And that he was suing essentially for that reason?

15   A.    Yes.

16   Q.    Did you believe that when you said it?

17   A.    To a small degree.

18   Q.    Why did you say it then?

19   A.    Because that's what I was instructed to say; that

20  Allan told me to be a good team player.    Chaz is only suing

21  for the money, and that was a portion of why he was suing.

22   Q.    You believe that, correct?

23   A.    Yes.    It was a portion, but it wasn't the only

24  reason he was suing.

25   Q.    What are the other reasons then?

1    Q.    Or at work.

2    A.    Yes.

3           MR. POTTS:  Well, wait a minute.  Wait a

4    minute.  Was it all done to you at work?

5           THE WITNESS:  There was harassment done --

6    telephone harassment and stuff that wasn't done at work.

7           MR. POTTS:  I just want to caution the witness

8    to listen closely to the question because the question, I

9    believe, is whether the harassment and emotional distress

10   that you're complaining of in this complaint was confined to

11   the workplace.  I believe that's the question.

12           MR. YAMAMOTO:  Correct.

13           THE WITNESS:  So in other words, you're saying

14   I was only distressed while at work?

15           MR. YAMAMOTO:  No.

16           MR. POTTS:  The wrongful conduct that you're

17   complaining of, did that extend outside of work?

18           THE WITNESS:  Yes.

19           MR. POTTS:  I think that's what he is getting

20   at.

21           THE WITNESS:  Sorry for the confusion.

22    Q.    The incidents that happened out of work -- the dead

23   rat being found on your car, the phone calls which I think

24   you started to mention before the objection -- you don't know

25   that that was done by any of the defendants, do you?

1    A.    I don't have any actual proof.

2    Q.    Do you have any evidence other than pure suspicion?

3    A.    Not on those.

4    Q.    On any of the incidents that occurred outside of

5 work, do you have any evidence or any proof beyond mere

6 suspicion?

7    A.    I don't believe so.

8    Q.    In terms of these -- other than the work with the

9 computer, did you ever tell anybody at the Liquor Commission

10 about your complaints or problems?

11    A.    Such as?

12        MR. POTTS:   You mean anybody including people

13 not named as defendants?   In other words, anyone including

14 other investigators?

15        MR. YAMAMOTO:   That's what I mean, yes.   Let

16 me ask it again because I'm confused now.

17    Q.    Did you tell anyone, including any of the

18 defendants, of any of the problems, harassment, or hostility

19 that you experienced or claimed to have experienced at work?

20    A.    Yes.

21    Q.    And who?

22    A.    Robert Durrick and I believe Steve Murakami.

23    Q.    Anybody else?

24    A.    I don't recall.

25    Q.    Who is Steve Murakami?

1    March of 2002; is that correct?

2        A.    Yes.

3        Q.    Did they make that statement again at another date

4    and time?

5        A.    I have to look at my interrogatories to tell you.

6        Q.    Sure.

7        A.    I'm sure they did.   (Reviewing document.)

8              MR. POTTS:   You mean ending up like Wiggins?

9              MR. YAMAMOTO:   Yes, that specific one.

10       Q.    Let me ask it this way rather than --

11             MR. POTTS:   He is going to reask the question.

12       Q.    It might be faster.   Would it be fair to say that

13   if it's not in the interrogatory response somewhere else,

14   that it only occurred in early March of 2002?

15             MR. POTTS:   I want to object because there has

16   been testimony that it occurred at least one other time,

17   during this deposition.

18             MR. YAMAMOTO:   I don't recall that.

19       Q.    Then I need you to answer that then.

20       A.    The question that you're referring to and my answer

21   in the interrogatory was a specific meeting between Arthur

22   Andres, Ken Wright, and myself.   There was only one meeting

23   where that was brought up, but there was other occasions

24   where Allan Gaylord would tell me or just make comments out

25   in general to the squad room about people that cooperated

94

1  could end up like either Wiggins or Collazo.   There was only

2  one meeting in March of 2002.

3      Q.   Okay.  But what I'm asking is was there another

4  specific time that they said someone would end up like

5  Charles Wiggins?  Not the other person; Charles Wiggins.

6      A.   Yes.  I don't have specific dates.  He did it on a

7  regular basis.

8      Q.   When was that?

9      A.   I don't have a specific date.

10     Q.   What year was it?

11     A.   2002.

12     Q.   After this March meeting?

13     A.   Yes.

14     Q.   How often did it occur then?

15     A.   Probably once or twice a month.   It was generally

16 when someone would bring up a comment about Wiggins.

17     Q.   It occurred one to two times per month in the squad

18 room?

19     A.   Yes.

20     Q.   Other people would have been present to hear it,

21 correct?  It wasn't just you, in other words?

22     A.   At times it was only me.

23     Q.   But there were other times when -- was it more

24 often just you, or was it more often with others?

25     A.   I don't recall.

1    Licensing as it was in Enforcement.

2         Q.   Did you agree with him?

3         A.   Yes.

4         Q.   Did you make the request of anybody else?

5         A.   For a new armor?  No.

6         Q.   Did you report the stolen or missing body armor to

7    anyone else?

8         A.   Yes.

9         Q.   Who?

10        A.   John Carroll and Wally Weatherwax.

11        Q.   What did they say?

12        A.   They both said, "We'll look into it," and Mr.

13   Weatherwax kind of laughed after it and walked away.

14        Q.   Anything else?

15        A.   No.

16        Q.   Did you have further discussions with either of

17   them following that?

18        A.   No.

19        Q.   You also claim that your assignment to Mayor Wright

20   Housing and Kuhio Park Terrace were, quote, bad, closed

21   quote; is that correct?

22        A.   Yes.

23        Q.   Both of those locations were part of the entities

24   that the Liquor Commission would investigate?

25        A.   No.

1    Q.    Those weren't active assignments to go to places

2    like Mayor Wright Housing and Kuhio Park Terrace?

3    A.    No.

4    Q.    So before you no one ever did it?

5    A.    We weren't making inspections.  We were delivering

6    subpoenas.

7    Q.    I see.  So you were given assignments to deliver

8    subpoenas?

9    A.    Correct.

10    Q.    But that was part of an assignment before you got

11    it.  In other words, somebody had to do it.

12    A.    Somebody had to do it, correct.

13    Q.    And you just felt it shouldn't be you?

14    A.    Correct.

15    Q.    And that was because you're Caucasian?

16    A.    Correct.

17    Q.    Any other reason?

18    A.    No.

19    Q.    Did anything happen to you when you did that at

20    either of those locations?

21    A.    I was taunted, but nothing besides taunting.

22    Q.    Do you know if the people who went before you were

23    taunted also?

24    A.    No, they weren't, to my knowledge.

25    Q.    Did you ask them if they were?

1    A.    I know of only one other person that went, and he

2    wasn't taunted.

3    Q.    Who was that?

4    A.    Ken Wright.

5    Q.    What nationality/ethnicity is he?

6    A.    He is Japanese, but he is 6 foot 5 and 400 pounds.

7    Q.    So you think it had to do with his size as opposed

8    to his ethnicity?

9    A.    It may have.

10    Q.    Is he 100 percent Japanese?

11    A.    He has got some Caucasian in him.

12    Q.    I would think so.

13    A.    Sumo.

14    Q.    Does he look more Japanese or more Caucasian?

15    A.    He looks hapa.

16    Q.    He did it before you?

17    A.    Yes.

18    Q.    Did he feel it was a bad assignment?

19    A.    He thought it was unjust that they gave it to me.

20    Q.    Why?

21    A.    He said considering I was Caucasian and that was a

22    place where Caucasians could get hurt badly.  Generally if

23    they had bad areas, they would send the correct people for

24    those areas that they fit in better.

25    Q.    Who do you think the correct person would have been

1  other than you?

2      A.    Ken.

3      Q.    Ken Wright?

4      A.    Yeah.

5      Q.    Just because he's big?

6      A.    Yeah.  Or Andres.  He's a local boy.

7      Q.    And that is because of his ethnicity, or is he big

8  also?

9      A.    No.  He is Filipino.

10      Q.    And if you're Filipino, it's okay to go to those

11  places?

12      A.    He has relatives that live in there.

13      Q.    That wouldn't be considered discriminatory?

14      A.    It would be considered --

15            MR. POTTS:  Objection.

16            THE WITNESS:  -- judicious management.  You

17  assign the correct people to the correct jobs.

18      Q.    Based upon ethnicity?

19      A.    If that's what it calls for.

20      Q.    That's okay, in your opinion?

21      A.    At times.  Just like profiling is appropriate at

22  times.

23      Q.    But you didn't otherwise have a problem with the

24  shifts that you were getting; is that correct?

25      A.    With the shifts?  I was getting bad assignments to

1    A.    Correct.

2    Q.    But your fellow -- maybe I misunderstood, but

3  earlier in your testimony I thought you had indicated that

4  there was no harassment or hostility from any of your

5  coworkers, your coinvestigators.

6    A.    It wasn't hostility.  It was just cold.  They would

7  not talk to me.

8    Q.    You didn't consider that part of the hostile work

9  environment?

10    A.    No.  If that was the only thing that was taking

11  place, I could have handled that.

12    Q.    So you did not consider that part of the hostile

13  work environment; is that correct?

14    A.    Coupled with everything else, yes.

15    Q.    Yes, that's correct?

16    A.    Yes, I do consider that along with everything else

17  a portion of the hostile work environment.  In and of itself

18  I didn't consider it.

19    Q.    But you didn't have any problems or issues with any

20  of your fellow inspectors, did you?

21    A.    Not that we would have altercations.  We could go

22  out on assignments together.

23    Q.    I'm asking you specifically did you feel that their

24  actions towards you in giving you the cold shoulder was

25  hostility from them towards you?

1    A.    Somewhat.

2    Q.    Did you tell them?

3    A.    No.

4    Q.    Why not?

5    A.    I didn't feel it would do any good.

6    Q.    What did you expect Management or what did you

7    expect the administrators to do with regard to coworkers

8    giving you the, quote/unquote, cold shoulder?

9    A.    They should be aware that it's happening and hold

10    meetings like they do in other departments.

11    Q.    And tell them to be nice to you?

12    A.    That it should be more open and flowing and not to

13    be leaving one person out or anything like that.

14    Q.    So did you report this cold-shoulder atmosphere to

15    your supervisors or to the administrators?

16    A.    I don't recall if I did.  I may have mentioned it

17    to Mr. Durrick or Steve Murakami.

18    Q.    G; in July of 2002 you are reassigned to Licensing,

19    according to your answer.  Do you see that?

20    A.    Uh-huh, yes.

21    Q.    Was there an open desk in Licensing at that time?

22    A.    There was an open space that a desk could be moved

23    to in Licensing.

24    Q.    Other than an open space, there was no desk itself

25    there; is that correct?

1    A.    No, there was no desk currently there.

2    Q.    How big was the open space?

3    A.    Ten by ten.

4    Q.    Ten feet by ten feet?

5    A.    Correct.

6    Q.    Did you ever ask to have your desk moved there?

7    A.    Yes.  That was the plans, was to put a desk there,

8    but they said they were going to be doing construction so

9    they wanted to wait until later.

10    Q.    Who did you ask, first?

11    A.    Robert Durrick.

12    Q.    And he told you they were going to do construction?

13    A.    He checked up the line and he was told by Daniel

14    Arakaki, the admin officer, that they were going to be doing

15    construction, but they had no idea when.

16    Q.    While you were there was the construction started?

17    A.    No.

18    Q.    But you were told that he had no idea when the

19    construction was going to start, correct?

20    A.    Yes.

21    Q.    I asked your son about this, but let me just

22    confirm that the dead rat found on your car was at your condo

23    garage, correct?

24    A.    Yes.

25    Q.    And it was your son who actually found it?

1     A.    Yes.

2     Q.    Did you go down and look at it before it was moved?

3     A.    I don't believe so.

4     Q.    So your son moved it?

5     A.    Yes.

6     Q.    Do you know what he did with it?

7     A.    No.

8     Q.    Was that ever reported to anybody; building

9 management, for example, or building security?

10     A.    I wouldn't so much say reported.  The manager is my

11 friend so I was discussing it with him.

12     Q.    Who is the manager?

13     A.    At that time I believe it was Charles Graham.

14     Q.    What did he say?

15     A.    He just said that's unbelievable.

16     Q.    Did he say he was going to look into it?

17     A.    Yeah.  He said he would check his security tapes to

18 see if he could see anything on it.

19     Q.    Did he?

20     A.    No.  Where my car was parked there is a -- they ran

21 out of money for cameras.  There is nothing that they could

22 see.

23     Q.    They didn't have a camera to see who was entering

24 the parking structure?

25     A.    There were big blind zones that they had at the

1    time so there were areas -- we had cars stolen out of there.

2         Q.    So he checked the tapes to see -- the tapes of the

3    whole parking garage to see if somebody that was not a

4    building tenant entered the structure sometime prior to that

5    event, did he?

6         A.    Correct.

7         Q.    He did do that?

8         A.    He told me he checked the tapes, and he didn't see

9    -- we had good cameras in the elevators and the foyers, and

10   he didn't see anybody coming from within the building out to

11   the garage which leads you to believe they came from outside

12   the building to do it.  He didn't see anything on the tapes

13   that he had cameras facing the areas.

14        Q.    You didn't have any problems with any of your

15   neighbors or other building tenants, did you?

16        A.    No.

17        Q.    Your car being stolen, that was the Mustang?

18        A.    Yes.

19        Q.    You reported that to the police?

20        A.    Yes.

21        Q.    You made out a report?

22        A.    Yes.

23        Q.    Did they ever find who stole it?

24        A.    I have no idea.

25        Q.    But they found the car, correct?

REPORTER'S CERTIFICATE

1

2

3

4        I, TONI ZIOMAS, Certified Shorthand Reporter,
certify:

5

6        That the foregoing proceedings were taken before me
at the time and place therein set forth, at which time the
witness was put under oath by me;

7

8        That the testimony of the witness, the questions
propounded, and all objections and statements made at the
time of the examination were recorded stenographically by me
9   and were thereafter transcribed.

10       That the foregoing is a true and correct transcript
of my shorthand notes so taken.

11

12       I further certify that I am not a relative or
employee of any attorney of the parties, nor financially
interested in the action.

13

14       I declare under penalty of perjury under the laws
of Washington that the foregoing is true and correct.

15

16   TONI L. ZIOMAS
     CSR NO. 2926

17

18

19

20

21

22

23

24

25

116

1                REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4        I, Toni L. Ziomas, Certified Shorthand Reporter in
the State of Washington, certify that the foregoing Pages 1
5   through 116 constitute a true and correct copy of the
deposition of Kerry Shannon, Volume II, taken on May 23,
6   2006.

7        I declare under penalty of perjury under the laws
of the state of Washington that the foregoing is true and
8   correct.

9   Dated this  5th  day of June, 2006.

10

11                              _____
                                TONI L. ZIOMAS
12                              CSR NO. 2926

13

14

15

16

17

18

19

20

21

22

23

24

25