```
 1                IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF HAWAII
 3                           - - -
 4   KERRY SHANNON,              )
                                 )
 5            Plaintiff,         )
                                 )
 6       vs.                     )   CIVIL NO. CV04-00086
                                 )   SPK/LEK
 7   CITY AND COUNTY OF HONOLULU; )
     HONOLULU LIQUOR COMMISSION; )   DEPOSITION OF
 8   JOHN SPIERLING; in his      )
     official capacity as chairman)  KERRY SHANNON (VOL. 1)
 9   of the Honolulu Liquor      )
     Commission; WALLACE W.      )   SEATTLE, WASHINGTON
10   WEATHERWAX, individually and)
     in his capacity as an agent )   MAY 22, 2006
11   and employee of the Honolulu)
     Liquor Commission; JOHN     )   ATKINSON-BAKER, INC.
12   CARROLL, individually and in )  COURT REPORTERS
     his capacity as an employee )   (800)288-3376
13   of the Honolulu Liquor      )   www.depo.com
     Commission; ANNA HIRAI,     )
14   individually and in her     )   REPORTED BY:
     capacity as an employee of  )   TYAN L. LUCAS,
15   the Honolulu Liquor         )   CCR NO. 1971
     Commission; ALLAN GAYLORD,  )
16   individually and in his     )   FILE NO.:   A0041D7
     capacity as an employee of  )
17   the Honolulu Liquor         )
     Commission; JOHN DOES 1-10, )
18   JANE DOES 1-10; DOE         )
     CORPORATIONS 1-10; DOE      )
19   PARTNERSHIPS 1-10; DOE      )
     GOVERNMENTAL AGENCIES 1-10, )
20                               )
              Defendants.        )
21   - - - - - - - - - - - - - - -
22
23
24
25              EXHIBIT   "C"
```

**CERTIFIED COPY**

1

1   driver's license?

2          A.    Correct.

3          Q.    And in terms of the positions that you held

4   with regard to the City and County and the liquor commission

5   specifically, you began sometime in 1999, correct?

6          A.    Correct.

7          Q.    And you were working approximately 40 hours per

8   week?

9          A.    Correct.

10         Q.    Do you remember the rate of pay when you

11  started?

12         A.    I don't recall.

13         Q.    Thereafter, were you ever disciplined during

14  your employment with the liquor commission?

15         A.    What do you mean by "disciplined"?

16         Q.    Actually, the only reason I ask that question

17  is because in the complaint that was filed on your behalf, it

18  indicated that you were never "fired, suspended or otherwise

19  disciplined during his employment with the liquor commission."

20         A.    No official.  I had a verbal counseling from

21  Weatherwax.

22         Q.    When was that?

23         A.    July of 2002.

24         Q.    Okay.  And what was the verbal counseling for?

25         A.    He alleged that I had made disparaging comments

1  about the commissioners.

2          Q.   Had you?

3          A.   I didn't say anything that wasn't true and that

4  could be looked up in the transcripts from the various

5  hearings.

6          Q.   But what specifically did you say, if you

7  recall?

8          A.   I had told somebody that this one restaurant

9  that they thought they were going to be able to enforce on for

10  no liquor license, I told them it wasn't going to happen

11  because the commission chairman and one of the other

12  commissioners, Spierling and Kwock, K-W-O-C-K, they patronized

13  the place.  And when I had previously cited them for selling

14  liquor without a license, they told me at the time they didn't

15  have to worry about it; that the commissioners eat there and

16  they take care of it and it was -- the case was dismissed.

17          Q.   When you say "they told you," who is "they"?

18          A.   The owner of the restaurant.

19          Q.   And who is that?

20          A.   I don't recall their name.

21          Q.   Other than being verbally counseled, was there

22  any type of disciplinary action taken?

23          A.   No.

24          Q.   Was there any adverse action taken other than

25  the verbal counseling?

1          A.    No.

2          Q.    In other words, there wasn't any kind of change

3     in your job, change in your rate of pay?

4          A.    I was transferred to -- from enforcement to

5     licensing.  I believe it was after that.

6          Q.    When you say "after that" --

7          A.    After the counseling session with

8     Mr. Weatherwax and Anna Hirai.

9          Q.    So was that sometime in August of '02?

10         A.    No.  It was July.

11         Q.    Okay.  Is that transfer to licensing, is that

12    something that you -- was desirable to you at the time?

13         A.    No.  I requested to stay in enforcement.

14         Q.    And why was that?

15         A.    Number one, I don't like day shift, and number

16    two, I felt safer at nights because I wasn't around the

17    hostilities in the squad room and various places in the

18    commission.  And all of the investigators were all brand-new.

19    They were retired policemen.

20         Q.    What do you do in licensing?

21         A.    Investigate license applications and process

22    them.

23         Q.    Do you know whether or not your bargaining

24    agreement with the City provided for a grievance process?

25         A.    For the move?

1          Q.   Well, could you have filed a grievance, to your

2   knowledge, with regard to this move -- or transfer I should

3   say?

4          A.   Not really, because it was a temporary

5   promotion.  I agreed to go along with it to help them, because

6   it was relayed to me by Allan Gaylord that it's, you know,

7   good to be a team player and help out in licensing and...

8          Q.   Well, when you say it's a temporary promotion,

9   what does that mean then?

10         A.   It was a promotion from my SR 18 to an SR 21 or

11  an Investigator 2 to Investigator 3.  So because it's

12  temporary, it's a voluntary.

13         Q.   When we say "voluntary," does that mean you

14  agreed?

15         A.   Yes, I did.

16         Q.   To your understanding, could you have not

17  agreed?

18         A.   No.

19         Q.   Why not?

20         A.   I was -- I was told to report there.  I didn't

21  want to go there.  And another investigator that was being

22  brought to the night shift, they didn't want to come to the

23  night shift.  He wanted to go there, and they said, "No.  This

24  is the way we're moving the bodies around."

25         Q.   So your understanding was you couldn't have

1    filed a grievance.  You just had to accept it?

2          A.    Yeah.  I felt pressure to take it.

3          Q.    Did that mean an increase in pay?

4          A.    Yes.

5          Q.    How much of an increase?

6          A.    Approximately 500 a month.

7          Q.    But that was not desirable?

8          A.    No, not with the working conditions.

9          Q.    And when you say "temporary," how long did that

10   last?

11         A.    Until I resigned in February of 2003.

12         Q.    When you said it was a temporary promotion, was

13   there a time period that it was supposed to end by?

14         A.    No.  It's considered temporary because the

15   position is empty and you're filling it until such time as

16   they decide to fill it permanently, so temporary could be four

17   or five years.

18         Q.    And could you request transfer back?

19         A.    I did.

20         Q.    And when did you request a transfer back?

21         A.    I believe it was in October of 2002.

22         Q.    And was that in writing?

23         A.    It was via e-mail, yes.

24         Q.    Do you have a copy of the e-mail?

25         A.    I don't recall if I -- I believe I gave a copy

1    of it to my attorney.

2         Q.    Okay.  So it should be part of the production

3    of documents that we have as Exhibit B?

4         A.    I believe so.

5         MR. POTTS:  It is the subject of some of the

6    documents you guys perused.

7         MR. YAMAMOTO:  Yeah.  That's my understanding, that

8    we produced it.  I don't remember if he had produced it.  I'll

9    take a look, though.

10        MR. POTTS:  Yeah, take a look.  I don't specifically

11   recall the document he's referring to here.  Unless we can --

12   if you want to specifically ask me to look for that, just let

13   me know when we get back.

14        MR. YAMAMOTO:  Yeah, I'll look for it first.  I

15   mean, I'm not saying it's not; I just don't recall it.

16        THE WITNESS:  It may have been produced by the City.

17   All my forms concerning this case are all together.  I don't

18   have it segregated into yours and ours.

19        Q.    Right.  And what was the response?

20        A.    That I was going to be sent back.

21        Q.    I'm sorry.  You would be sent back?

22        A.    Yes.  I could go back to the enforcement.

23        Q.    And do you know why --

24        A.    Because --

25        Q.    Oh, you go ahead.

1          Q.    Was it soon after this February 2002 meeting?

2          A.    Most likely.

3          Q.    I understand from your discovery responses,

4    specifically Exhibit B, that you do not have any type of

5    diaries, logs, a recordation of any type as to when these

6    meetings occurred; is that correct?

7          A.    Correct.

8          Q.    What makes you say it's most likely?

9          A.    Because it -- if I answered that I figured one

10   of them had told them, it would have been immediately after

11   the meeting or shortly thereafter the meeting.

12         Q.    Right.  What makes you say that it was one of

13   those four - Weatherwax, Carroll, Gaylord or Hirai - that told

14   these gentlemen?

15         A.    They were the only ones that were at the

16   meeting and they were the only ones that see the other

17   investigators, because they work at night.

18         Q.    Any other reason?

19         A.    No.

20         Q.    Did anyone else know that you were that -- or

21   that you had testified before the grand jury?

22         A.    As far as investigators?

23         Q.    Or anyone else other than the FBI, police

24   department, the grand jury and these four individuals, the

25   four defendants, did anyone else know that you had testified

1    That's the May 2002 injury, correct?

2         A.    Correct.

3         Q.    And you said that the workers' compensation

4    claim was delayed by one or more of the defendants.    Which

5    defendant or defendants?

6         A.    Initially by Allan Gaylord and then by John

7    Carroll and Weatherwax.

8         Q.    And how long was it delayed by these gentlemen?

9         A.    The total amount of time was 21 days.

10         Q.    And how do you know it was delayed by them?

11         A.    I got a copy of it from work comp, and I saw

12    when it actually was signed and submitted at each place, each

13    person signed it and how long they had it.

14         Q.    Okay.    But you don't know if any of them were

15    out of town or any reason why it was delayed in terms of the

16    signature?

17         A.    They were all there.    Allan Gaylord was

18    conducting his own private investigation into what had

19    happened.    And he went out to the club, and he didn't think it

20    could happen because the girl was smaller than me.    And then

21    he had Ken Wright write another report because he witnessed

22    it.    And that's not the proper procedure.    You're supposed to

23    -- it's right on the form, you must submit it within 48 hours,

24    I believe it is, to work comp so that they can process it and

25    start approving medical and therapy and the like.

1        Q.   And so specifically, were there events,

2    incidences that were part of the pattern of harassment that

3    occurred in 2003?

4        A.   Can you restate the question?

5        Q.   Sure.  Were there any incidences that comprise

6    your pattern of harassment and hostility as described in the

7    complaint that occurred in the year 2003?

8        A.   They -- my computer would get turned off every

9    time I would go out.  I would lose data that was on there.  At

10   the beginning I thought it was accidental, but I put a sign on

11   the computer, "Please do not turn off," and it was still

12   turned off.  I brought that to the attention of my supervisor,

13   and he was supposed to initiate an investigation, but nothing

14   ever came of it as far as I know.

15       Q.   When did you first advise your supervisor of

16   that?

17       A.   I don't recall.  He --

18       Q.   Was it in -- oh, go ahead.

19       A.   He wrote a memo that went up through the chain

20   of command.  I was given a copy, but it got lost in the move.

21       Q.   Who was the supervisor?

22       A.   Robert Durrick.

23       Q.   Can you spell the last name?

24       A.   D-U-R-I-C-K [sic].

25       Q.   And let me ask again, just so I'm clear, you

1   don't know whether or not you advised your supervisor of this

2   in the end of 2002 or early 2003?

3          A.   No.   I'm not sure.

4          Q.   And specifically, I take it there wasn't an

5   investigation as far as you know?

6          A.   No.   They -- my computer continued to be turned

7   off up until I left.   People would go in and read my e-mail

8   and go through and read documents that I had on there, so they

9   were searching through the computer, which I didn't mind

10  because it's a city computer, so the supervisors have a right

11  to look at my computer.   But turning it off so I lose data is

12  inappropriate.

13         Q.   Do you know who did that?

14         A.   No.

15         Q.   Did anybody ever say they saw someone do that?

16         A.   Robert Durrick said he believed that Allan

17  Gaylord was doing it, because he saw him walking around there,

18  but he didn't specifically see him.   And Allan Gaylord said

19  that he saw Robert Durrick by my desk, so...

20         Q.   To your knowledge, was any fingerprinting done

21  to --

22         A.   No.

23         Q.   -- determine who was touching it?

24         A.   No.

25         Q.   How many times did this occur?

1    morning and then turn it off when they go home.

2          Q.    But if you were going out into the field, it

3    wasn't your practice to turn it off?

4          A.    No.

5          Q.    When you go out into the field, even as an

6    example, the Turtle Bay situation, did you know it was going

7    to take multiple hours, maybe as much as a day?

8          A.    Yes.  That instance, I may have turned it off

9    if I knew I wasn't going to come back for the whole day.  Most

10    of the licensees are in the Honolulu area, so it's not all

11    that far from the office.

12          Q.    Other than that computer being turned off,

13    anything else that occurred in 2003 that was part of a pattern

14    of harassment or hostility?

15          A.    I receive telephone threats at my house, and

16    the phone was traced to a pay phone on Kapiolani, so I have no

17    idea who would have done it.  It was a male voice and said

18    that, "You can move to Washington but your mom and Louie" --

19    my stepdad, they're still here, and Grace, and they knew my

20    family's name.  So they said -- and then they hung up.  So I

21    took that as a threat on my family's life.

22          Q.    Do you know who made any of these calls?

23          A.    No.

24          Q.    Do you have any suspicions who made these

25    calls, recognize even partial voice --

1        A.    No.

2        Q.    -- recognition?

3        A.    No.

4        Q.    And did the person do anything on any of these

5   calls to disguise his voice?

6        A.    It sounded like they were trying to change

7   their voice.  I don't know if they put something over the

8   phone or whatever, but...

9        Q.    But you didn't recognize it, for example, as

10  one of your coworkers --

11       A.    No.

12       Q.    -- or of any of the defendants in this matter?

13       A.    No.  No.

14       Q.    You mentioned the one -- well, you mentioned

15  that the person or the caller said that you could move to

16  Washington.

17            So did this happen soon before your resignation?

18       A.    Yeah.  I believe it was about a week before I

19  put in my resignation, so it was very early January, and then

20  it happened -- actually, I believe it happened on three

21  occasions.

22       Q.    And do you have any explanation as to how this

23  person would know you were planning to move to Washington?

24       A.    People in the office knew I was moving to

25  Washington.

1        Q.    Even before you resigned?

2        A.    Yeah, because -- well, it must have been after

3    I resigned.  So I stand corrected.  It would have had to have

4    been after that because that's when I told people that I was

5    going to be going to Washington.

6        Q.    Did you tell people why you were going to

7    Washington?

8        A.    I don't recall if I did or not.

9        Q.    How many occasions did you receive these calls?

10   You personally, I mean.

11       A.    I believe it was three.

12       Q.    All in 2003?

13       A.    Yes.

14       Q.    Or partially in 2002 and partially 2003?

15       A.    I believe it was all 2003.

16       Q.    And all after you put in your letter of

17   resignation?

18       A.    It must have been, if they knew, because --

19       MR. POTTS:  I don't want you to guess, but -- I'm

20   sorry.  I just want to caution the witness not to guess.  But

21   if he has a recollection of that, then he should so testify.

22       A.    Can you restate the question?

23       Q.    Sure.  Were all of these telephone calls that

24   had threats in them all after you turned in your letter of

25   resignation?

1  your attorney, and I'm not trying to get into discussions that

2  you had with your attorney.  Okay?  So keeping that in mind,

3  though, my question is:  Did you review the complaint before

4  it was filed?

5        A.   I believe so.

6        Q.   Did you agree with the terminology and wording

7  of the complaint?

8        A.   Yes.

9        Q.   And in fact, did you have the opportunity to

10  make any changes you felt was necessary?

11        A.   Yes.

12        Q.   Did you agree, then, at the time you reviewed

13  it before it was filed that the allegations and terminology of

14  the complaint?

15        A.   Yes.

16        Q.   But at this point, you disagree with the term

17  or phrase "medical retirement"?

18        A.   Yes.

19        Q.   Okay.  Because it's used in multiple

20  paragraphs.  And what is your disagreement with medical

21  retirement?

22        A.   I resigned.  I wasn't -- I applied for medical

23  retirement in November of 2002.  In January, I was told that

24  it was probably going to be denied unless there was more

25  documentation from my doctor.

1          So seeing I wasn't assured of any medical retirement

2    and because of the harassment and the stress, I put in my

3    resignation.  I wasn't granted a retirement until I was living

4    in Washington.

5          Q.    Okay.  Are you claiming that if you had been

6    given a medical retirement, you would have been entitled to

7    greater benefits than you are receiving currently?

8          A.    No.

9          Q.    Are you claiming that -- strike that.

10         Was the medical requirement request actually denied

11   or were you just told that?

12         A.    I was called, or I called them, the employee

13   retirement system, to find out the status.  And I was told

14   that they were currently -- it had been reviewed.  And

15   apparently whoever I just spoke to - I don't recall who it

16   was - but they looked and said it was going to be denied.  So

17   they were, I guess, holding their decision in abeyance until

18   such time if I -- they were going to give me a certain amount

19   of time to submit more documentation.  And they did send me a

20   letter to that effect.

21         Q.    Did you submit the additional documentation or

22   you just chose not to?

23         A.    No.  I had my doctor -- I contacted my doctor

24   and she submitted further documentation.

25         Q.    And were you told after that submittal that

1   that wasn't enough again?

2          A.    No.

3          Q.    So you don't know whether or not that would

4   have been sufficient?

5          A.    It was sufficient.

6          Q.    To get the retirement?

7          A.    Yes.

8          MR. POTTS:  It was granted.

9          A.    I was granted a retirement.

10         Q.    Okay.  So you -- were you granted the

11  retirement but after the resignation?

12         A.    Yes.

13         Q.    When were you granted the retirement?

14         A.    In March.

15         Q.    Of?

16         A.    2003.

17         Actually, I believe it was March 30th, and I had

18  resigned the 14th, so it was -- I was already out of work for

19  six weeks, not knowing if I was going to get a retirement.

20         Q.    What made you apply for the medical retirement

21  in November of '02, 2002?

22         A.    My headaches were getting a lot worse from all

23  of the computer work I was doing, coupled with the amount of

24  stress and anxiety I was having.

25         Q.    Anything else?

1      A.   The amount of pain medication that I had to

2 take to combat the migraines had more than doubled, and I also

3 had to get my liver and kidneys checked more regularly because

4 my physician was afraid that all the medication would be

5 harming my liver and kidneys.

6      Q.   Anything else?

7      A.   Not that I can recall.  But I'm sure there

8 probably are, but I can't recall at this point.

9      Q.   Okay.  But you said the pain medication,

10 specifically with regards to the migraines, more than doubled.

11 Does that mean that before any of this or the allegations that

12 you have in this complaint occurred that you were having

13 migraines?

14      A.   I would get migraines generally on an average

15 of once a month prior to this.  The medication I take is not

16 just for the migraines.  It's also for my knee and the neck

17 pain.

18      Q.   Sure.

19      A.   So -- and it increased also for the pain.  So

20 it wasn't just the -- the amount of migraines wasn't the only

21 factor in increasing the amount of medication.

22      Q.   Has any doctor given you the opinion that

23 because of the situation at work, your medications increased?

24      A.   I believe Dr. Rasmussen increased the dosage or

25 the quantity because I had complained of -- my neck was

114

1    getting worse and that I got migraines from it because I was

2    doing more computer work.

3            Q.    Right.  But has any doctor, Dr. Rasmussen

4    included, told you that she was increasing or he was

5    increasing the medications because of the situation at work?

6            A.    She said she was increasing it to take care of

7    the problem that was -- I was now having.

8            Q.    And what problem was that?

9            A.    My neck pain was increased, and that was due to

10   computer use.

11           Q.    Did she or any doctor recommend any type of

12   counseling?

13           A.    As far as what type of counseling?  Psychiatric

14   or pain management counseling or...

15           Q.    Either pain management counseling, psychiatric

16   counseling, psychological counseling?

17           A.    No, never for psychological.  Dr. Rasmussen

18   said that if the pain were going to continue to get -- keep

19   escalating as it was, that I might want to be seen by a pain

20   management specialist.

21           Q.    Did she refer you to such a specialist?

22           A.    No, not at that time.  She said to let her know

23   if it was continuing to get worse.

24           Q.    But these pains that you had, you had to

25   varying degrees, but you had since 1994 essentially, correct?

115

1          A.    Yeah.

2          Q.    Yes?

3          A.    Yes.

4          Q.    And now it was -- at least even before these

5  situations occurred some eight years later, she didn't

6  recommend the pain management specialist?

7          A.    No.  She was not the original doctor on the

8  case.  She had just taken over because Dr. Simmons had

9  retired.

10         Q.    I'm sorry.  What is his first name?

11         A.    Robin.

12         Q.    And he was your original doctor?

13         A.    Yes.

14         THE COURT REPORTER:  Dr. Simmons, did you say?  I'm

15  sorry.

16         THE WITNESS:  Yeah.

17         Q.    In terms of the lost income, is that the lost

18  income -- strike that.

19         Have you seen the report created by...

20         MR. POTTS:  Dr. Suyderhoud.

21         Q.    Dr. Suyderhoud -- thank you -- have you seen

22  that report?

23         A.    Yes, I have.

24         Q.    Okay.  And is that the claim of loss of income

25  that you have?

116

1  establishment, get out, walk inside, make a check, which may

2  last five or ten minutes.  Inside the establishment, we would,

3  depending on what we were doing, if it's a record check, we

4  would sit down at a table and check it, and went back to the

5  car.  So it wasn't strenuous.

6        Q.    Okay.  But the injury that you sustained in May

7  of 2002 was from someone pulling on your arm, right?

8        A.    Yes.

9        Q.    While on duty?

10       A.    Right.

11       Q.    And at times you would be required to respond

12 physically, or not?

13       A.    If we were apprehending a minor coming out of a

14 store, we could put our hand on them and -- I mean, we had

15 handcuffs if we had to arrest somebody.

16       Q.    Other than handcuffs, were you provided any

17 other devices, restraints?

18       A.    No.

19       Q.    Did you carry a firearm?

20       A.    Yes, I did.

21       Q.    While you were on duty as a --

22       A.    Yes, I did.

23       Q.    Excuse me.

24             While you were on duty as a Liquor Control

25 Investigator II?

1          A.   Yes.

2          Q.   Were you required to?

3          A.   No.

4          Q.   Why did you?

5          A.   For personal protection.  I was afraid.

6          Q.   When did you start carrying a weapon?

7          A.   I don't really recall the exact date.  It was

8    probably in early 2002.

9          Q.   When you say "early" --

10         A.   January or February.  Around that time.  I

11   don't recall the specifics.

12         Q.   And what were you afraid of?

13         A.   What might happen if I go into a bar.  Some of

14   them are known to have guns and drugs, and I was sent into

15   those.  I was sent into neighborhoods that being a Caucasian

16   was not a good place to go to serve subpoenas, and just

17   general I felt someone could drive by and shoot me or what

18   have you.

19         Q.   And were liquor control investigators permitted

20   to carry firearms?

21         A.   Permitted by who?

22         Q.   By the liquor commission?

23         A.   No.

24         Q.   They were not?

25         A.   No.

REPORTER'S CERTIFICATE

1

2

3

4          I, TYAN L. LUCAS, CCR No. 1971, Certified Shorthand

5   Reporter, certify;

6          That the foregoing proceedings were taken before me

7   at the time and place therein set forth, at which time the

8   witness was put under oath by me;

9          That the testimony of the witness, the questions

10  propounded, and all objections and statements made at the time

11  of the examination were recorded stenographically by me and

12  were thereafter transcribed;

13         That the foregoing is a true and correct transcript

14  of my shorthand notes so taken.

15         I further certify that I am not a relative or

16  employee of any attorney of the parties, nor financially

17  interested in the action.

18         I declare under penalty of perjury under the laws of

19  Washington that the foregoing is true and correct.

20         Dated this 1st day of June, 2006.

21

22

23

24         TYAN L. LUCAS, C.C.R. No. 1971

25

157

1         REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4        I, TYAN L. LUCAS, CCR No. 1971, a Certified

5  Shorthand Reporter in the State of Washington, certify that

6  the foregoing pages 1 through 157, constitute a true and

7  correct copy of the original deposition of KERRY SHANNON (VOL.

8  1) taken on May 22, 2006.

9        I declare under penalty of perjury under the laws of

10  the State of Washington that the foregoing is true and

11  correct.

12

13        Dated this 1st day of June, 2006.

14

15

16

17      TYAN L. LUCAS, C.C.R. No. 1971

18

19

20

21

22

23

24

25